UNITED STATES, Appellee

v.

John H. STEBBINS, Staff Sergeant
U.S. Army, Appellant

No. 03-0678

Crim. App. No. 20000497

United States Court of Appeals for the Armed Forces

Argued January 26, 2005

Decided August 30, 2005

GIERKE, C.J., delivered the opinion of the Court, in which
CRAWFORD, EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  David P. Sheldon, Esquire (argued); Karen L.
Hecker, Esquire, Major Allyson Lambert, and Captain Eilin J.
Chiang (on brief).

For Appellee:  Captain Abraham F. Carpio (argued); Lieutenant
Colonel Margaret B. Baines, Lieutenant Colonel Mark L. Johnson,
Lieutenant Colonel Steven T. Salata, Lieutenant Colonel Mark A.
Visger, and Major Theresa A. Gallagher (on brief).

Military Judge:  Keith H. Hodges


**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

Consistent with his pleas, Staff Sergeant John Stebbins was found guilty of rape of a child under the age of twelve on divers occasions and sodomy of a child under the age of twelve, in violation of Articles 120 and 125 of the Uniform Code of Military Justice (UCMJ).[1]  He was tried and convicted by a military judge sitting as a general court-martial and sentenced to a dishonorable discharge, confinement for thirty years, reduction in rank to E-1, a $75,000.00 fine, and confinement of an additional five years if he failed to pay the fine.  The convening authority approved the sentence as adjudged, except that he did not approve the additional confinement contingent on failure to pay the fine.  The United States Army Court of Criminal Appeals subsequently affirmed the findings and sentence.[2]

Congress passed a bill authorizing the punishment of confinement for life without eligibility for parole (LWOP) on November 6, 1997,[3] and the President signed the bill into law on November 18, 1997.[4]  But the President did not amend the Manual for Courts-Martial (MCM or Manual) to incorporate the punishment

---

[1] 10 U.S.C. §§ 920, 925 (2000).
[2] United States v. Stebbins, No. ARMY 20000497 (A. Ct. Crim. App. Aug. 20, 2003) (unpublished).
[3] National Defense Authorization Act for Fiscal Year 1998, Pub. L. No. 105-85, § 581(b), 111 Stat. 1759 (1997).
[4] 143 Cong. Rec. H10961 (Dec. 15, 1997).

until April 11, 2002.[5] Appellant now claims that LWOP was not an authorized punishment for his offenses. We granted review to determine whether:

> BECAUSE LIFE WITHOUT PAROLE WAS NOT AN AUTHORIZED PUNISHMENT UNDER THE CODE FOR THE CHARGED OFFENSES, THE PRETRIAL AGREEMENT IS A NULLITY AND IT, AND THE FINDINGS AND SENTENCE ON WHICH IT WAS BASED, SHOULD BE SET ASIDE BECAUSE APPELLANT ENTERED INTO THE AGREEMENT BASED ON A MATERIAL MISUNDERSTANDING OF THIS ISSUE.[6]

Next, Appellant claims that Rule for Courts-Martial (R.C.M.) 1003(b)(3) requires an accused to be "unjustly enriched" before a fine can be imposed as punishment and, thus, the $75,000.00 fine imposed by the military judge was improper because he was not "unjustly enriched" as a result of his offenses.[7] Accordingly, we also granted review of the following issue:

> WHETHER THE MILITARY JUDGE IMPROPERLY IMPOSED A SENTENCE THAT INCLUDED A $75,000 FINE WHERE APPELLANT WAS NOT UNJUSTLY ENRICHED BY HIS CRIMES.[8]

We now hold that LWOP was authorized for Appellant's offense of rape, and that it was not error to impose the $75,000.00 fine. Accordingly, we affirm the decision of the Army Court of Criminal Appeals.

---

[5] Exec. Order No. 13,262, 67 Fed. Reg. 18,773, 18,779 (Apr. 11, 2002).
[6] United States v. Stebbins, 59 M.J. 463, 463 (C.A.A.F. 2004)(order granting review).
[7] See R.C.M. 1003(b)(3) discussion.
[8] Stebbins, 59 M.J. at 463.

BACKGROUND

Appellant enlisted in the Army on June 4, 1996, for a term of six years. His military record reflects exceptional service as an Army Ranger, and he was awarded a Silver Star for his heroism in Mogadishu, Somalia, in the incident that later became the basis of the book and movie Black Hawk Down.

Unfortunately, the heroism Appellant displayed on the battlefield did not translate into his home life. Sometime around October 1, 1998, when Appellant and his family lived at Fort Benning, Georgia, he began sexually abusing his six-year-old daughter, MS. Appellant approached MS and asked her whether she had seen him in bed with his wife. After she replied that she had, Appellant made MS remove her clothes, lie face down on the bed and spread her legs. He then raped her. Appellant admits that he raped MS at least two more times before September 30, 1999. Before raping MS for a third time, Appellant also forcibly sodomized her.

Appellant's offenses were discovered on March 17, 1999, after Appellant and his wife separated and were living apart. In response to an argument Appellant and his wife had over the telephone, MS, who was then seven, told her mother that she was "mad at him" and that she "hate[d] him" "[b]ecause he did sex to me." When questioned by her mother, MS indicated that Appellant

4

had penetrated her genitals and anus and had placed his penis in her mouth.

## DISCUSSION

I.   LWOP is an Authorized Punishment for Rape After November 18, 1997

At trial, the military judge advised Appellant that LWOP was the maximum punishment for his offenses.  Appellant entered a pretrial agreement based on this assumption.  As noted above, although Congress passed a bill authorizing LWOP on November 6, 1997, which the President signed into law on November 18, 1997, the President did not incorporate this punishment into the MCM until April 11, 2002.

In United States v. Ronghi,[9] we held that LWOP was an authorized punishment for premeditated murders committed after November 18, 1997.  Although Ronghi did not address the availability of LWOP for any other offenses, we find the reasoning in that case controlling in this case.  Applying its principles to the offense of rape committed after November 18, 1997, we now hold that LWOP was authorized for Appellant's offenses.

Article 56a of the UCMJ, enacted on November 18, 1997,[10] states that a court-martial may adjudge a sentence of LWOP for

---

[9] 60 M.J. 83, 86 (C.A.A.F. 2004).
[10] Pub. L. No. 105-85, § 581(b), 111 Stat. at 1759; see also Ronghi, 60 M.J. at 84.

5

"any offense for which a sentence of confinement for life may be adjudged."[11]  Under Article 120, UCMJ, the maximum punishment for the offense of rape is "death or such other punishment as a court-martial may direct."[12]  Because confinement for life is a lesser punishment than death, Congress authorized confinement for life as a possible punishment for rape as "such other punishment as a court-martial may direct."[13]  Therefore, when Congress adopted Article 56a, it intended to authorize LWOP as another available sentence for a rape that occurred after November 18, 1997.

In Ronghi, we noted that under Article 118, UCMJ,[14] Congress explicitly authorized "death or imprisonment for life as a court-martial may direct" as the maximum authorized punishment for premeditated murder.[15]  Article 120 does not include "imprisonment for life" in the text of the statute.  But this distinction between the texts of Article 118 and Article 120 does not change the fact that confinement for life is still a lesser punishment than death and clearly falls within Article 120's authorization of "such other punishment as a court-martial may direct."[16]  Therefore, "absent some other statutory provision

---

[11] 10 U.S.C. § 856a(a) (2000).
[12] 10 U.S.C. § 920.
[13] Id.
[14] 10 U.S.C. § 918 (2000).
[15] See 60 M.J. at 84 (emphasis added).
[16] Article 120(a), UCMJ, 10 U.S.C. § 920(a) (2000); see also Article 118, UCMJ, 10 U.S.C. § 918 (2000).

6

limiting LWOP's availability, it was an authorized sentence" when Appellant committed his offenses between October 1, 1998, and September 30, 1999.[17]

Congress is not the only decision maker in establishing limitations on the punishments available for those sentenced by courts-martial. The President may also prescribe limitations on the maximum punishment that a court-martial may direct.[18] Thus, the next question we must answer is whether the President imposed any limitation on LWOP as a punishment applicable to the rape of a child in 1998 and 1999.

As noted in Ronghi,[19] the President executed the authority delegated to him by Congress by establishing maximum punishments in Part IV of the MCM. In setting the maximum punishment for rape, the President mirrored the language used by Congress, providing that the maximum punishment for rape is "[d]eath or such other punishment as a court-martial may direct."[20] Therefore, because LWOP is a lesser punishment than death, no conflict exists between the Manual's maximum sentence provision, death, and the congressionally-authorized sentence of LWOP in a

---

[17] 60 M.J. at 84.

[18] See Article 56, UCMJ; see also Article 18, UCMJ, 10 U.S.C. § 818 (2000) (establishing jurisdiction of general courts-martial to adjudge punishment "under such limitations as the President may prescribe").

[19] 60 M.J. at 85.

[20] MCM (2002 ed.), pt. IV, ¶ 45.e.(1).

rape case.[21]  Additionally, the President explicitly recognized LWOP as an authorized sentence "only" for "offenses committed after November 18, 1997."[22]  Appellant committed his offenses in 1998 and 1999.  Finally, as we found in Ronghi, R.C.M. 1003, which lists the kinds of punishments that a court-martial may impose, does not proscribe LWOP as a form of punishment.  Although R.C.M. 1003 does not specifically list LWOP, it "nevertheless allow[s] LWOP, because it is not a new form of punishment, but simply a longer term of confinement than military law had previously allowed a court-martial to adjudge."[23]

Appellant argues that Ronghi is distinguishable from this case because, while death was clearly an authorized punishment for premeditated murder in the 2000 edition of the MCM, the Supreme Court has held that the Constitution forbids the death penalty for the rape of an adult woman.[24]  Appellant relies on the Supreme Court's holding in Coker v. Georgia, which held that a death sentence for the rape of an adult woman is "grossly disproportionate and excessive punishment" proscribed by the Eighth Amendment.[25]  Based on this holding, Appellant argues that

---

[21] See Ronghi, 60 M.J. at 85.
[22] Exec. Order 13,262 § 6.b, 67 Fed. Reg. 18,773, 18,779 (Apr. 11, 2000).
[23] Ronghi, 60 M.J. at 85 (emphasis omitted).
[24] See Coker v. Georgia, 433 U.S. 584, 599 (1977).
[25] Id. at 592.

8

confinement for life rather than death is the maximum authorized punishment for rape and that, because LWOP is not a lesser punishment than life, it cannot be considered as the maximum punishment in this case.

Appellant's argument is inapposite to the issue in this case. In this case, we need not decide the scope and extent of the plurality opinion in Coker. The issue in this case is not whether Appellant can be executed for the offense of rape. Rather, the issue is whether Congress authorized LWOP for Appellant's offense of rape and whether the President has subsequently imposed any limitations on the imposition of LWOP as punishment for the rape of minor.

Additionally, we have explicitly held that "rape is an offense punishable by death for purposes of exempting it from the 5-year statute of limitations in Article 43(b)(1)."[26] In doing so, we stated that "the question of whether the death penalty may be imposed, given the facts and circumstances of any particular case, does not control the statute of limitations issue."[27] Similarly, we need not answer the question of whether Appellant may actually be sentenced to death for raping his daughter when she was six and seven. Rather, the question in this case focuses on whether the President established a maximum

---

[26] Willenbring v. Neurauter, 48 M.J. 152, 180 (C.A.A.F. 1998).
[27] Id. at 178 (internal quotation marks and citations omitted).

sentence less than LWOP for rapes that occurred in 1998 and 1999.  We conclude that, because the President authorized death for Appellant's offenses, the 1998 MCM did not preclude a sentence of LWOP for rape.

We now hold that LWOP is an authorized punishment for Appellant's offense of rape of his daughter, which occurred after November 18, 1997.  Accordingly, the pretrial agreement is not null and void because Appellant was correctly instructed by the military judge as well as defense counsel that LWOP was an available punishment for rape.  Additionally, there was no material misunderstanding when he signed the pretrial agreement.

II.  Fines May Be Imposed in the Absence of Unjust Enrichment

As part of Appellant's sentence, the military judge imposed a $75,000 fine against Appellant and sentenced him to contingent confinement if he failed to pay the fine.  The military judge also recommended to the convening authority that the fine be disapproved "under the conditions that a trust fund in the amount of $25,000 be established for the sole purpose of providing medical treatment to the spouse and to the child."  On October 2, 2000, the convening authority approved the fine, without approving either the contingent confinement or establishment of the trust fund.

A.  Unjust Enrichment

Appellant argues that the military judge erred when he imposed a fine as part of Appellant's punishment because Appellant was not unjustly enriched as a result of his offenses. R.C.M. 1003(b)(3) provides that any court-martial may adjudge a fine instead of forfeitures.  The discussion accompanying R.C.M. 1003(b)(3) states that "[a] fine <u>normally</u> should not be adjudged against a member of the armed forces unless the accused was unjustly enriched as a result of the offense of which convicted."[28]  We conclude that the use of "normally" in the rule's nonbinding discussion indicates that "unjust enrichment" is not always a prerequisite to imposing a fine as part of an accused's sentence.  Therefore, we conclude that the military judge did not err in this case by imposing a fine on Appellant in the absence of unjust enrichment.

R.C.M. 1003 lists the punishments authorized for any case in which an accused is convicted, "[s]ubject to the limitations in this Manual."[29]  As noted above, R.C.M. 1003(b)(3) explicitly provides that "[a]ny court-martial may adjudge a fine in lieu of or in addition to forfeitures."[30]  A plain reading of this language indicates that fines are available to be imposed on any accused who is convicted and that there is no requirement of

---

[28] R.C.M. 1003(b)(3) discussion (emphasis added).
[29] R.C.M. 1003(a).
[30] R.C.M. 1003(b)(3).

"unjust enrichment" for a fine to be imposed in Appellant's case.

The "unjust enrichment" language first appeared in the 1949 Army and Air Force editions of the Manual for Courts-Martial. These editions of the Manual, which were essentially identical, stated that a "fine should not ordinarily be adjudged against an officer, warrant officer, or enlisted person unless the accused was unjustly enriched by means of an offense of which he is convicted."[31]  Although the 1949 editions of the Manual did not explicitly explain why this language was first included in the Manual, a look at other pre-UCMJ editions of the Manual for Courts-Martial suggests the reasons.

Historically, fines were considered "especially appropriate to those offences which consist in a misappropriation or misapplication of public funds or property, being in general adjudged with a view mainly to the reimbursement of the United States for some amount illegally diverted to private purposes."[32] Therefore, the 1921 MCM, U.S. Army, notes that a fine is "especially recognized" as a form of punishment in Article of War 94, Frauds Against the Government,[33] and the 1928 MCM, U.S. Army, states that a fine is "expressly recognized" as a form of

---

[31] MCM (1949 ed.), ¶ 117c, § B (emphasis added).
[32] William Winthrop, Military Law and Precedents 419 (2d ed. 1920)[hereinafter Winthrop].
[33] MCM, U.S. Army (1921 ed.), ¶ 317.

punishment in both Article of War 94, and Article of War 80,

Dealing in Captured or Abandoned Property.[34]  Also, the 1949 Army

and Air Force editions of the Manual included the "unjust

enrichment" language with the following qualifier:  that an

accused should not be adjudged a fine in the absence of unjust

enrichment for "an offense of which he is convicted involving

loss to the United States or violative of military directives."[35]

Therefore, it is clear that the drafters of these pre-UCMJ

editions of the Manual for Courts-Martial viewed fines as the

appropriate punishment for those offenses that clearly involved

the need to make the government whole for money or property

taken from it.[36]

---

[34] MCM, U.S. Army (1928 ed.), ¶ 103g.
[35] MCM, U.S. Army (1949 ed.), ¶ 117c, § B; MCM, U.S. Air Force (1949 ed.), ¶ 117c, § B.
[36] See, e.g., War Department Technical Manual 27-255, Military Justice Procedure ¶ 125b (1945) (asserting that "[f]ines should not be imposed on military personnel . . . , except perhaps in the case of aggravated embezzlements or other frauds by a disbursing officer, for instance, where a large sum is necessary to make good the defalcation"); Seminars on the 1949 Manual for Courts-Martial 96 (Dec. 1948), microformed on OCLC No. 31272962 88-026, at F2/2 (Law Library Microform Consortium) (noting that although "a fine may be adjudged against any enlisted person, in lieu of forfeitures, for any offense listed in the Table of Maximum Punishments, . . . [t]hose provisions [regarding unjust enrichment] were inserted as authority for the imposition of a fine in lieu of forfeitures in the case, for example, of embezzlement by a finance officer or in the case of black marketeering"); Colonel Charles L. Decker, Legal and Legislative Basis, Manual for Courts-Martial United States 182 (1951), available at http://www.loc.gov/rr/frd/Military_Law/CM-manual_1951.html (stating that those against whom a fine should be adjudged as "unjustly enriched" for their offenses include

Not only were fines historically limited to specific offenses, but forfeiting the pay of a servicemember was viewed as preferable to imposing a fine because of the relative administrative ease in executing forfeitures. More specifically, the drafters of the MCM recognized that the least difficult way to obtain money from a servicemember as punishment would be by subtracting money from that servicemember's pay. "Where indeed the pecuniary liability of the offender is comparatively slight, forfeiture of pay, as being more readily executed, is a penalty preferable to fine."[37]

The drafters' belief that forfeitures could be executed against servicemembers more easily than fines is further evidenced in the differences between the possible punishments that could be imposed on officers and enlisted members. For example, the 1921 Manual provides that only officers could be fined.[38] Sentences for enlisted soldiers, on the other hand, could include forfeiture or detention -- which is a form of withholding a certain amount of the accused's pay that is ultimately returned upon separation from the service.[39] The 1928 Manual states that "[d]etention of pay would not be imposed

---

"of course, . . . the finance officer who absconds with government funds, and the black marketeer").
[37] Winthrop, supra note 32, at 419.
[38] MCM, U.S. Army (1921 ed.), ¶ 310.
[39] Id. ¶ 311.

. . . except on enlisted men of the Army."[40] Although detention of pay was still an authorized punishment in the 1949 editions of the Manual, fines became an authorized punishment for enlisted personnel, as well as officers, so long as a dishonorable discharge was also adjudged in the case.[41]

In general, it appears that the drafters of the 1949 editions of the Manual incorporated forfeitures and fines as punishments based on two main historical premises: (1) that forfeitures were preferred because they were administratively easier to secure from those servicemembers who were convicted, and (2) that the Articles of War expressly authorized fines in cases involving fraud against the government or abandoned or captured property -- both offenses which, in essence, involve property or money stolen from the government. The fine thus provided the means of making the government whole.

A preference for forfeitures, however, in no way precludes the imposition of fines for certain offenses even in the absence of unjust enrichment. While the history indicating a preference for forfeitures over fines explains why the "unjust enrichment" language first appeared in the Manual, it also illustrates that the drafters did not address the direct question of whether fines are permissible for offenses other than those that

---

[40] MCM, U.S. Army (1928 ed.), ¶ 103g.
[41] MCM, U.S. Army (1949 ed.), ¶ 117c, § B.

involved direct material loss to the Government.  As stated in the Army's analysis of the 1951 Manual:

> Although the Manual provides that a fine should not "ordinarily" be adjudged against a member of the armed forces unless [an] accused was unjustly enriched by means of the offense, this is not an absolute rule.  The Manual contemplates that fines may be adjudged where no unjust enrichment is present, because par[agraph] 126h(3) permits any [court-martial] to adjudge a fine instead of an authorized forfeiture where the Art[icle] involved authorizes punishment as a [court-martial] may direct.[42]

We read the historical absence of explicit limitations on the imposition of fines for those offenses that did not involve direct loss to the United States as consistent with the President's authorization to impose fines in cases that may not involve "unjust enrichment."

Accordingly, in United States v. Hounshell, we held that "[c]ourts-martial have the power to adjudge fines instead of forfeitures in all cases in which the article of the Uniform Code violated by the accused authorizes punishment as a court-martial may direct."[43]  And, in United States v. Cuen, we noted that the language regarding "unjust enrichment" is precatory text and, therefore, "it is clear" that a fine could be imposed in lieu of forfeitures on an accused convicted of absence without leave and assault and battery.[44]

---

[42] Cumulative Pocket Part to the Manual for Courts-Martial, United States Army (1951 ed.) ¶ 126h (1956).
[43] 7 C.M.A. 3, 5, 21 C.M.R. 129, 131 (1956).
[44] 9 C.M.A. 332, 337 n.5, 26 C.M.R. 112, 117 n.5 (1958).

The conclusion that fines can be imposed even in the absence of unjust enrichment is supported by a historical analysis and this Court's precedent, along with intermediate military appellate case law.[45] We now hold that, based on the plain language of the rule as well as the history of a fine as punishment, it is not unlawful to impose a fine where there is no unjust enrichment.[46] Our inquiry does not end here, however,

---

[45] See United States v. Parini, 12 M.J. 679, 684-85 (A.C.M.R. 1981) (noting that there "is no legal requirement that such [unjust] enrichment accrue before a fine can be legitimately imposed" and upholding a $15,000 fine for convictions of indecent assault and conduct unbecoming an officer); United States v. Galvan, 9 C.M.R. 156 (A.B.R. 1953) (upholding a $1,000 fine for drunken driving and leaving the scene of an accident); United States v. Ashley, 48 C.M.R. 102, 105 (A.F.C.M.R. 1973) (approving a fine of $10,000 for willful disobedience of orders); United States v. Kehrli, 44 C.M.R. 582, 584-85 (A.F.C.M.R. 1971)(affirming a fine of $15,000 for drug-related offenses); United States v. Finlay, 6 M.J. 727, 729 (A.C.M.R. 1978) (reducing a fine of $30,000 to $2,000 for a conviction for unauthorized absences); United States v. Czeck, 28 M.J. 563, 564-65 (N.M.C.M.R. 1989) (affirming a fine of $2,682 for wrongful use of a controlled substance, failure to obey a regulation and conspiracy).

[46] Holding that a fine may be a legal punishment in certain situations in no way implies that it is an appropriate punishment in all cases. Therefore, our holding does not disturb the holdings of the Courts of Criminal Appeals that conclude a fine is inappropriate in some situations. See, e.g., United States v. Price, No. ACM 33389, 1999 WL 385748, at *2 (A.F. Ct. Crim. App. May 27, 1999) (unpublished) (noting that fines can be given where there is no unjust enrichment, but reducing an "inappropriate" $5,000 to the amount that the appellant was unjustly enriched, $600); United States v. Word, No. NMCMR 880316, 1988 CMR LEXIS 415, at *1 (N.M.C.M.R. June 21, 1988) (unpublished) (setting aside a fine as "an inappropriate, albeit legal, punishment" where there was no indication the accused was unjustly enriched under the circumstances); United States v. Espineira, No. NMCMR 881410, 1988 CMR LEXIS 680, at *1 (N.M.C.M.R. Sept. 7, 1988) (unpublished) (disapproving the fine

---

because we must now decide whether the $75,000 fine imposed on Appellant violated the Excessive Fines Clause of the Eighth Amendment.

B.    The Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted."[47]    In United States v. Bajakajian,[48] the Supreme Court set out a two-pronged analysis for determining whether the Excessive Fines Clause is violated. First, a court must determine if the fine falls within the Excessive Fines Clause and, if so, whether the fine is excessive.[49]

In this case, Appellant claims that, although his crimes were serious, the $75,000 fine is not proportional to the offenses, especially considering the other punishments imposed on Appellant.    We must first determine whether the $75,000 fine is a fine within the meaning of the Excessive Fines Clause.[50]

---

where there was no evidence of unjust enrichment or "any other good reason for the fine").

[47] U.S. Const. amend. VIII.

[48] 524 U.S. 321 (1998).

[49] Id. at 329.

[50] In United States v. Reed, 54 M.J. 37, 44-45 (C.A.A.F. 2000), we applied the Supreme Court's analysis and determined that the impending loss of retirement benefits is a collateral consequence rather than a fine for purposes of the Excessive Fines Clause.    Therefore, we did not need to reach the second prong of the Supreme Court's analysis and held that the Excessive Fines Clause was not violated.    Id. at 44.

This first prong of the Excessive Fines Clause analysis is clearly met in this case. As the Supreme Court explained, "at the time the Constitution was adopted, 'the word "fine" was understood to mean a payment to a sovereign as punishment for some offense.'"[51] The $75,000 fine was directly imposed on Appellant as part of his sentence and was to be paid to the government as punishment for committing the offense.

The next question is whether the $75,000 fine was excessive. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."[52] Therefore, if a fine is "grossly disproportionate to the gravity of a defendant's offense," it violates the Excessive Fines Clause.[53] This proportionality analysis under the Excessive Fines Clause is conducted on a case-by-case basis and is distinguishable from the determination of sentence appropriateness required by Article 66.[54]

Although counseling against a strict proportionality between the amount of punitive forfeiture and the gravity of a criminal offense, because such judgment is better left to the

---

[51] Bajakajian, 524 U.S. at 327-28 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989)).
[52] Id. at 334.
[53] Id.
[54] See Article 66, UCMJ; 10 U.S.C. § 866 (2000).

legislature, the Supreme Court articulated various factors to be analyzed in determining whether a fine was grossly disproportionate.[55] First, a court should look to the nature of the offense and then question whether it is related to any other illegal activities by the accused.[56] Second, the court should assess whether the accused "fit[s] into the class of persons for whom the statute was principally designed."[57] Third, if the maximum sentence under the Federal Sentencing Guidelines is relatively low, then this confirms a "minimal level of culpability."[58] Finally, a court should determine the level of harm caused by the accused's offense by asking both who is affected by the offense and the magnitude of harm to those affected.[59] In Bajakajian, for example, the Supreme Court stated that only the Government was harmed by the failure of an international traveler to report that he was traveling with $357,144, in violation of a statute that required him to report more than $10,000.[60] The Court also concluded that the harm to the Government was minimal.[61] Comparing the gravity of the harm caused by defendant's failure to accurately report the amount of money he was carrying with the fine the Government sought to

---

[55] Bajakajian, at 337-40.
[56] Id. at 337-38.
[57] Id. at 338.
[58] Id. at 338-39.
[59] Id. at 339.
[60] Id.
[61] Id.

impose, which was the entire $357,144, the Supreme Court concluded the forfeiture would be "grossly disproportionate to the gravity of his offense."[62]

Applying the factors from Bajakajian, we now conclude that the $75,000 fine imposed on Appellant was not "grossly disproportionate to the gravity of his offense."[63]  First, the nature of Appellant's offense was severe -- the repeated rape and forcible sodomy of his six-year-old daughter.  There is no way to measure the psychological and mental effect this abuse will have on MS for the rest of her life.  At trial, MS's mother testified that, after the abuse, MS had no self-esteem, was always "very weepy," started to wet her bed at night and her pants at school, began to have frequent nightmares, and expressed a desire to kill herself.  MS then began attending counseling.  A medical exam conducted on MS revealed that MS's body was so physically traumatized that she suffered from significant physical defects.  The nature of Appellant's crime was extremely severe and far from the relatively harmless nature of the failure to report the value of the currency the defendant was carrying in Bajakajian.

Second, there is no doubt Appellant falls into "the class of persons for whom [Articles 120 and 125 were] principally

---

[62] Id. at 334.
[63] Id.

21

designed" -- those individuals who commit rape and forcible sodomy.[64]  Third, the congressionally-prescribed maximum punishment authorized for rape under Article 120 is the most severe sentence known to the law: death.[65]  This penalty in no way "confirm[s] a minimum level of culpability,"[66] and instead indicates that Congress and the President intended to punish these offenses severely.  Appellant was sentenced to thirty years of confinement, the $75,000 fine, a dishonorable discharge, and reduction to E-1.  Appellant's sentence was significantly less than the maximum authorized for his offenses. Finally, as discussed above, the harm caused to MS by Appellant's offenses is extremely severe.  The Sentencing Guidelines for the federal civilian system are instructive to our proportionality review in this case.[67]  Under the United States Sentencing Guidelines, had Appellant been tried in the civilian system, his offense of criminal sexual abuse with a minor under the age of twelve at the time of the offense would have authorized a fine anywhere between $17,500 and $175,000.[68]

---

[64] Bajakajian, 524 U.S. at 338.
[65] 10 U.S.C. § 920.
[66] Bajakajian, 524 U.S. at 339.
[67] See U.S. Sentencing Guidelines Manual § 5E1.2 (2004).
[68] See id. § 2A3.1(b)(2)(A), § 5E1.2. The potential fine against Appellant, had he been tried in a civilian court, may have been increased even further to $200,000 because his daughter was "in the custody, care, or supervisory control of [Appellant]."  Id. § 2A3.1(b)(3).

Comparing the gravity of the repeated rape and forcible sodomy of Appellant's six-year-old daughter with the $75,000 fine, we conclude that the fine is in no way "grossly disproportionate to the gravity of his offense."[69]  Therefore, based on the facts of this case, Appellant's sentence did not violate the Excessive Fines Clause.

C.  Due Process Concerns

In this case, we need not answer any Due Process concerns that may arise in other cases when fines are imposed on an accused as part of his sentence and contingent confinement is imposed for failure to pay.[70]  In United States v. Tuggle,[71] we held, based on R.C.M. 113(d)(3), that the Due Process Clause is violated when confinement is imposed as a sanction for failure to pay a fine where the probationer has made good-faith efforts to pay but cannot because of indigency and the court below denied the accused the opportunity to make a good-faith effort to pay.  In this case, the convening authority did not approve the portion of the military judge's sentence that provided for

---

[69] Id. at 334.

[70] Nor need we consider whether a military judge or convening authority may appropriately condition the imposition of a fine on satisfaction of a condition not expressly provided for under the UCMJ.  In this case, the military judge recommended to the convening authority that he disapprove the fine on the condition that Appellant establish a trust fund for his victim.  However, the convening authority did not adopt that recommendation.

[71] 34 M.J. 89, 92-93 (C.M.A. 1992).

five years of contingent confinement for the failure to pay his fine. Moreover, Appellant has neither attempted to pay this fine nor asserted that he is unable to do so. Therefore, we need not reach any questions regarding due process concerns in this case.[72]

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

---

[72] This case illustrates that due process concerns may arise when military judges impose fines because of the absence of any guidance in the UCMJ on the appropriate range of minimum and maximum fines for certain offenses. We invite the Joint Services Committee to consider whether the Manual should include standards for the imposition of fines.