# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

### No. ACM 40376

---

### UNITED STATES
*Appellee*

**v.**

### William T. COOLEY
Major General (O-8), U.S. Air Force, *Appellant*

---

Appeal from the United States Air Force Trial Judiciary[1]

Decided 29 July 2025

---

*Military Judge*: Christina M. Jimenez.

*Sentence*: Sentence adjudged 26 April 2022 by GCM convened at Wright-Patterson Air Force Base, Ohio. Sentence entered by military judge on 3 June 2022: Forfeiture of $10,910.00 pay per month for five months and a reprimand.

*For Appellant*: Major Heather M. Bruha, USAF; Terri R. Zimmermann, Esquire.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Morgan R. Christie, USAF; Major Kate E. Lee, USAF; Major Brittany M. Speirs, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge GRUEN joined.

---

[1] Appellant appeals his conviction under Article 66(b)(1(A), Uniform Code of Military Justice, 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.)).

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2,3] The military judge sentenced Appellant to forfeiture of $10,910.00 pay per month for five months and a reprimand. The convening authority took no action on the findings, approved the entire sentence, and provided the language of the reprimand.

Appellant raises seven issues on appeal: (1) whether the findings of guilty are legally and factually sufficient; (2) whether the military judge abused her discretion in admitting prior consistent statements by the victim and her husband; (3) whether the military judge abused her discretion by sustaining objections during cross-examination of a prosecution witness; (4) whether the military judge abused her discretion by denying a defense request to take judicial notice of a change in the law; (5) whether Appellant's sentence is inappropriately severe; (6) whether the application of the 18 U.S.C. § 922 firearms prohibition to Appellant warrants correction; and (7) whether the notation regarding sex offender registration in the indorsement to the entry of judgment requires correction.[4] In addition, although not raised by Appellant, we consider (8) whether Appellant is entitled to relief for facially unreasonable post-trial delay.

We have carefully considered issue (6) and find Appellant is entitled to no relief. *United States v. Johnson*, __ M.J. __, No. 24-0004, 2025 CAAF LEXIS 499, at *9–11 (C.A.A.F. 24 Jun. 2025) (holding Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2), "does not give the [Court of Criminal Appeals] authority to modify the [18 U.S.C.] § 922 indication"). We have carefully reviewed issue (7) and find it requires neither further discussion nor relief. *See United States v.*

————————————

[2] Unless otherwise indicated, all references to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.), and all other references to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] The military judge found Appellant not guilty of two specifications of abusive sexual contact in violation of Article 120, UCMJ.

[4] Appellant personally raises issue (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

*Matias*, 25 M.J. 356, 361 (C.M.A. 1987). With respect to the remaining issues, we find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND[5]

In August 2018, Appellant was the commander of the Air Force Research Laboratory (AFRL) and stationed at its headquarters at Wright-Patterson Air Force Base (AFB), Ohio. Appellant's brother, TC, worked as an Air Force civilian employee at a division of AFRL located at Kirtland AFB, New Mexico. TC lived in Albuquerque, New Mexico, with his wife MC,[6] who was not an Air Force employee. As of August 2018, Appellant had known his sister-in-law MC for approximately 30 years. According to MC, during most of that time Appellant had not been particularly friendly toward her; however, in the preceding year or two Appellant had become friendlier, acting "thoughtful," "kind," and "[s]howing a genuine interest in [her]."

On the weekend of 11–12 August 2018, Appellant was in Albuquerque for work-related reasons. Appellant spent the night of Saturday, 11 August 2018, at the home of TC and MC. Appellant spent part of the day on Sunday, 12 August 2018, at the home of his parents, who also lived in Albuquerque not far from TC and MC. Appellant initially planned to spend the night of 12 August 2018 at his parents' house. However, Appellant returned to TC and MC's house later that day to attend a barbeque dinner in their back yard. In addition to Appellant, TC, and MC, the barbeque was attended by Appellant's parents; CC, the daughter of TC and MC; and DH and DM,[7] a married couple who were close family friends. MC later testified she consumed approximately "a glass and a half" of sangria over the course of four or five hours, and she did not feel intoxicated at all. MC testified Appellant also drank some amount of sangria as well as approximately "two inches" of whiskey, but he did not appear intoxicated either.

Appellant's parents were the first to leave the barbeque, followed by DH and DM around 2100. CC went to bed shortly thereafter. Appellant, TC, and MC continued socializing in the kitchen. Appellant indicated he would prefer to spend the night at TC and MC's house again rather than the parents' house.

---

[5] The following background is drawn in large part from MC's trial testimony; unless otherwise indicated, quotations are from her testimony.

[6] TC and MC both possessed PhD degrees; in this opinion we omit their "Dr." titles for the sake of simplicity and ease of reading.

[7] For the sake of simplicity and ease of reading, we omit DH's and DM's professional titles.

TC and MC offered to let Appellant stay at their house that night. At that point Appellant asked MC to drive him to the parents' house to retrieve his suitcase, and she agreed.

MC and Appellant got in MC's Jeep to drive to the parents' house, a trip that MC estimated would take at most two minutes each way. After MC backed the vehicle into the street and put her hand on the gear shift to put it in drive, Appellant put his hand on top of hers. MC was initially "stunned" because Appellant "had never done anything like this before." MC withdrew her hand and continued driving, and asked Appellant if he was "okay." Appellant then asked MC whether she ever fantasized about him. Appellant told MC he had been thinking about her and thought she was beautiful, and told her he "wanted to f[**]k [her] in the pool today" and "wanted [her] to suck his c[**]k." Again MC was stunned because Appellant had never spoken to her like that before, and she told him she did not fantasize about him or feel any "sexual tension" between them.

When they arrived at the parents' house, Appellant got out of the Jeep and went inside. MC stayed in the vehicle, "shaking" and "trying to collect [her] thoughts." She thought of using her phone to record whatever happened on the ride back to her house, but she dropped the phone on the floor of the vehicle as Appellant returned to it. As MC began driving away from the parents' house, Appellant put his hand over hers again and this time intertwined their fingers. According to MC, Appellant then "yank[ed]" her right hand toward him and forced it "onto his genitals" over his pants. MC "yank[ed] [her] hand back" and told him to "[S]top. Just stop." Appellant responded "something to th[e] effect" of "[M], I don't know. I'm all man."

During the rest of the drive, MC attempted to change the subject and continued talking "simply trying to distract [Appellant]." According to MC, after she parked in her garage and before she could unfasten her seat belt, Appellant put his hands on her shoulders and pushed her against the vehicle's window. Appellant then put his mouth on her mouth and, according to MC, "shove[d] his tongue down [her] throat." Appellant "cupped" MC's breast with his hand, then put the same hand "between [her] legs" and touched her "genital area" over her clothing. MC then pushed Appellant back into his seat and told him to stop. Appellant attempted to move toward MC again, but she again pushed him back and told him to stop.

Shortly thereafter, TC came into the garage, looked into the Jeep, and asked if everything was "okay," or something to that effect. Either MC or Appellant responded to the effect that everything was okay. MC got out of the vehicle and went to bed without talking to Appellant or TC any more that evening.

The following Monday morning, 13 August 2018, MC walked into the kitchen to find Appellant and TC having breakfast together. At one point, TC left the room to get a tie. Appellant quietly asked MC, "We're good, right?" In response, MC "just shook [her] head a little bit and said nothing." After Appellant and TC drove to work together, MC stayed at home, missing some work meetings and spending "a lot of time crying." That evening, MC told TC about what had happened with Appellant the night before. TC appeared "shock[ed]."

On 14 August 2018, MC left a lengthy message on Appellant's phone, spread over three consecutive recordings. MC told Appellant, *inter alia*, that she was "stunned" but "flattered" by his actions, and that Appellant should search his head and heart to "uncover the root" of his behavior. MC told Appellant that she had told TC they had "kissed," but her message did not refer to the other sexual contact she later described in her testimony. At trial, MC explained the relatively friendly and hopeful tone of her messages was due to her hope they would be able to "work through this" and "salvage" their relationship.

Initially, neither MC nor TC reported Appellant's behavior to law enforcement or Air Force authorities. Instead, over the next 12 months MC and TC exchanged a series of communications with Appellant about the incident via emails and other means. They repeatedly requested Appellant take various steps to acknowledge his responsibility and show contrition for the 12 August 2018 incident with MC, including *inter alia* that he apologize in detail for his actions, admit his behavior to certain family members, and enroll in a "therapy treatment program." At first, Appellant responded to these messages positively. For example, at their request, Appellant attended a counseling session with MC, TC, and their therapist. He repeatedly apologized, expressed regret, and described his self-reflection and desire to improve himself. He admitted to having kissed MC and put his tongue in her mouth. Appellant paid MC and TC $891.00 for what they calculated as their costs due to the incident. However, over time, MC and TC expressed dissatisfaction with Appellant's response in various respects, and in particular were offended by any suggestion that MC had contributed to the incident by, for example, being at all flirtatious on 12 August 2018. MC and TC repeatedly suggested they might report the incident if Appellant failed to satisfy their requests.

On 18 August 2019, after he sent the check for $891.00, Appellant sent TC an email wherein, *inter alia*, he accused TC and MC of "blackmail," stated he would not "participate" anymore, and threatened to contact the Air Force Office of Special Investigations (OSI). Appellant stated:

> I've admitted and owned my part from the night of 12 Aug[ust]
> 2018--what I did was wrong, I apologized for it, and both you and
> [MC] accepted my apology but I refuse to participate in a false

narrative that continues to misconstrue the events of that night (characterizing it as an attack).

. . . .

This ends here.

MC and TC eventually reported the 12 August 2018 incident and were interviewed by OSI agents in December 2019. Ultimately, the military judge found Appellant guilty of one specification of abusive sexual contact in violation of Article 120, UCMJ, for "kissing [MC] on the mouth with his lips and tongue" without her consent. The military judge found Appellant not guilty of two other specifications of abusive sexual contact by allegedly causing MC to touch his genitals with her hand through his clothing, and touching MC's breast and genitals with his hand through her clothing.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The [applicable[8]] test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (third alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order to convict Appellant of abusive sexual contact as alleged in Specification 1 of the Charge, the Government was required to prove that Appellant committed sexual contact on MC—specifically, by kissing her on the mouth with his lips and tongue—by causing bodily harm and with intent to gratify his sexual desires. *See* 10 U.S.C. § 920(d); *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.b.(8)(b). As relevant to this case, "sexual contact" includes "any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person. Touching may be accomplished by any part of the body." 10 U.S.C. § 920(g)(2)(B) (2016 *MCM*). "The term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." 10 U.S.C. § 920(g)(3) (2016 *MCM).*

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* An honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See, e.g., United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of honest and reasonable mistake of fact to general intent offense of sexual assault); *United States v. Lee*, No. ACM 39531 (f rev), 2020 CCA LEXIS 61, at *19–22 (A.F. Ct. Crim. App. 26 Feb. 2020) (unpub. op.) (applying *McDonald* to hold

---

[8] Because the offense for which Appellant was convicted occurred before 1 January 2021, statutory changes to our factual sufficiency review under Article 66, UCMJ, 10 U.S.C. § 866, that came into effect on that date do not apply in this case. *See generally United States v. Harvey*, 85 M.J. 127, 129–30 (C.A.A.F. 2024).

abusive sexual contact is also a general intent offense). While the quantity of evidence required to raise the mistake of fact defense is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted).

### 2. Analysis

The Government introduced sufficient evidence for a rational trier of fact to find Appellant guilty of abusive sexual contact by kissing MC as charged. First, MC provided clear testimony that Appellant kissed her on the mouth with his lips and tongue in her vehicle in Albuquerque on the night of 12 August 2018. As described by MC, Appellant did so by suddenly coming out of his seat, putting his hands on her shoulders, and pushing her against the window of her vehicle. Her testimony was reinforced by evidence of several substantially consistent statements MC made to her spouse TC and three other friends and confidants within several weeks of the incident. In addition, the Government introduced messages after the incident wherein Appellant admitted kissing MC with his tongue.

Moreover, the trier of fact could reasonably conclude MC did not consent, and therefore Appellant committed the contact by causing bodily harm. MC testified Appellant had never engaged in such behavior with her before, and that she did not consent on this occasion. Additionally, the trier of fact could conclude Appellant did not have a reasonable mistake of fact that MC consented. MC testified she did not reciprocate or respond positively to Appellant's unexpected verbal and physical advances that preceded the kiss. In order to kiss her, Appellant pushed her against the window of her vehicle with his hands. Even after MC pushed Appellant off her and told him to stop, Appellant moved toward her again and MC had to push him away again.

Furthermore, the trier of fact could easily find Appellant kissed MC with the intent to gratify his sexual desires. The nature of the act—kissing MC on the mouth and inserting his tongue—suggests sexual gratification. Moreover, Appellant preceded this act with several comments indicating his sexual interest and fantasies regarding MC. Even without taking into account MC's testimony that Appellant also forced MC to touch his genitalia and put his hand on her breast and genitalia—conduct of which the military judge found Appellant not guilty—the Government introduced ample evidence to show that Appellant's motive in kissing MC was his sexual gratification.

Appellant attacks MC's credibility, which he describes as "the sole issue in the case," and contends the Government failed to prove Appellant kissed MC without consent. We do not find his arguments persuasive.

As at trial, Appellant focuses considerable attention on the voice messages MC left on Appellant's phone on 14 August 2018, which were introduced in evidence. It is true that the tone of these scripted messages was hopeful and conciliatory rather than angry or accusatory. However, as MC explained at trial, this was because at that point MC sought to "work through" the incident to preserve important longstanding family relationships. Although relatively friendly, MC's messages nevertheless conveyed surprise and disapproval of his actions, rather than consensual participation. We do not find these messages significantly undercut MC's trial testimony.

Appellant cites TC's testimony that he did not notice anything unusual about MC after she got out of the vehicle on 12 August 2018. Appellant contends TC's testimony undercuts MC's testimony that she was frightened and upset after the incident with Appellant. However, TC's testimony merely suggests MC successfully concealed her distress from TC that night, as she evidently intended. This is not particularly surprising because when TC went to the garage that night, he was not anticipating trouble, MC or Appellant had just told him everything was all right, and MC went to bed and avoided speaking with TC any further that night.

Appellant contends MC had a strong motive to fabricate her version of events to conceal any consensual behavior with Appellant in order to protect her marriage to TC. However, this argument is somewhat undermined by the fact MC herself revealed the incident to TC the following day, when she potentially could have concealed it indefinitely. In any event, we find MC's understandable concern for how this incident with Appellant, her brother-in-law, would affect her marriage does not cast substantial doubt on the Government's proof, to include MC's clear testimony and Appellant's apologies and admissions.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the trial judge personally observed the witnesses, we also find the evidence factually sufficient.

**B. Prior Consistent Statements**

**1. Additional Background**

Trial defense counsel's cross-examination of MC elicited, *inter alia*, that by August 2019 Appellant had threatened TC's career and that Appellant had accused MC and TC of blackmailing him. Trial defense counsel further suggested through his questioning that MC's Internet search history indicated that in December 2019, MC was concerned Appellant might be chosen to lead the

newly established United States Space Force, although MC's responses did not indorse that suggestion.

On direct examination, TC described what MC said on 13 August 2018 when she first told him about what Appellant had done the night before. TC testified MC told him that Appellant "had pushed [MC] against the car door and forced his tongue down her throat. And had -- had grabbed for -- grabbed for her breasts, and also said some -- she relayed some of the things that [Appellant] had said that were very hurtful to me."

Trial defense counsel's cross-examination of TC included the following colloquy:

> Q. [TC], when was the last time you talked to your wife about her testimony?
>
> A. I have not talked to her about her testimony, other than to ask how it went or how she feels.
>
> Q. And when was that?
>
> A. Today.
>
> Q. You've been sitting in the same room as her today, right?
>
> A. Yes.
>
> Q. You did so yesterday as well?
>
> A. Yes.

Over the Defense's objection, trial counsel subsequently elicited testimony from several witnesses regarding pretrial statements TC and MC had made about the alleged offenses. We summarize each of these in turn.

Special Agent (SA) GL was an OSI agent who was present at an interview with TC in December 2019. SA GL laid the foundation for Prosecution Exhibit (PE) 26, a disc containing an audiovisual recording of a portion of that interview. When trial counsel moved to admit PE 26, the Defense objected on the basis of hearsay. In response, trial counsel argued the recording was admissible as a prior consistent statement, citing trial defense counsel's cross-examination as to whether TC had discussed MC's testimony with her and had sat together with her during the trial. In response, trial defense counsel argued TC's statement in the interview was not consistent with TC's testimony and did not rebut an implication of improper influence on TC's testimony. The military judge sustained the Defense's objection in part and overruled it in part. She found trial defense counsel's questions "were an effort to imply a recent fabrication of [TC] about presence with the prior witness [MC] [and] discussion of testimony." She ruled that a 27-second portion of the recorded interview was admissible as a prior consistent statement by TC, and the other portions of PE

26 were excluded. In the admitted portion of the recording, TC states that MC initially told him Appellant had pushed MC against the vehicle window, kissed her and put his tongue in her mouth, and tried to touch her "inappropriately" before MC pushed Appellant off her.

The Government called DH, one of the family friends who attended the barbeque on 12 August 2018. DH testified, *inter alia*, that "several weeks" after the barbeque TC and MC invited DH and his spouse, DM, to brunch. Trial counsel asked DH what MC told him at the brunch about what had happened on 12 August 2018; trial defense counsel objected to hearsay. When the military judge initially sustained the hearsay objection, trial counsel explained the Government sought to introduce this testimony as a prior consistent statement to counter "a series of motives to lie" the Defense had raised. Trial counsel cited trial defense counsel's suggestions that MC was concerned about Appellant leading the Space Force in December 2019, as well as Appellant's threats to TC's career and allegations of blackmail in summer 2019. The military judge eventually overruled the objection, holding that she "will consider that to as consideration of the motives to fabricate raised in the August, spring, winter, 2019 career blackmail allegations." DH then testified MC told him Appellant "had attempted to kiss her and pushed her against the door of the car, and she had had to forcefully push him away."

The Government then called DM, DH's spouse, who also attended the brunch with TC and MC. Similar to what had occurred when DH testified, the military judge overruled a defense hearsay objection to DM's testimony regarding what MC told him about the night of 12 August 2018, as a prior consistent statement by MC. DM testified MC said Appellant "put his hand on top of her hand on the gearshift, and made a comment — a suggestive comment. And she said she pulled her hand away and tried to make light of it. And then that he then tried to forcefully kiss her and pushed her against the car."

The Government later called CM, another friend of MC and a member of the clergy. CM testified that he met with MC in a coffee shop in Albuquerque at her request on 22 August 2018. Once again, the military judge overruled a defense hearsay objection and permitted the witness to testify to MC's description of Appellant's actions on 12 August 2018 as a prior consistent statement. CM testified MC told him, *inter alia*,

> there was some conversation about how that [MC] really — that [Appellant] knew [MC] had always wanted him and that she needed a real man. And that he began to, sort of, touch her across the seats, either her hand or her leg, I can't remember. And that [MC] was kind of trying to rebuff all of that and was kind of shocked by what was going on.

> When they got back to the house, he attacked her, forcibly kissed her, touched her, and kind of pinned her against the side — her side of the car, if I remember correctly. And she was able to kind of push him off, beat him off, and get out of the car.

### 2. Law

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citing *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013) (citation omitted). "[T]he abuse of discretion standard is strict, 'calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)).

Hearsay is generally inadmissible unless an exception applies. Mil. R. Evid. 802. However, Mil. R. Evid. 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

The United States Court of Appeals for the Armed Forces (CAAF) has identified three criteria for out-of-court statements to be admissible as a non-hearsay prior consistent statement under Mil. R. Evid. 801(d)(1)(B)(i): "(1) the declarant of the statement must testify and must be subject to cross-examination about the prior statement; (2) the statement must be consistent with the declarant's testimony; and (3) the statement must be offered 'to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying.'" *Frost*, 79 M.J. at 109–10 (quoting Mil. R. Evid. 801(d)(1)(B)(i)). In addition, "the prior statement . . . must precede any motive to fabricate or improper influence that it is offered to rebut," and "where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Id.* at 110 (citations omitted). The prior consistent statement need not be identical to the witness's testimony in order to be admissible under Mil. R. Evid. 801(d)(1)(B), provided it is "for the most part consistent" and "consistent with respect to . . . fact[s] of central importance to the trial." *Finch*, 79 M.J. at 395 (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)) (omission and alteration in original).

### 3. Analysis

Appellant contends the military judge abused her discretion by admitting a portion of PE 26 and the portions of the testimony of DH, DM, and CM described above as prior consistent statements by TC and MC. We disagree.

With respect to PE 26, the military judge could reasonably conclude trial defense counsel's questions to TC about sitting together with MC during the court-martial tended to suggest an improper influence on his testimony. The admitted portion of PE 26 was from TC's OSI interview in December 2019, long before TC's trial testimony in April 2022. Moreover, TC's statements to OSI were substantially consistent with TC's testimony about what MC had told him regarding the charged offenses and the facts of central importance to the trial.

With respect to the testimony of DH, DM, and CM, in each case the military judge could reasonably conclude trial defense counsel's cross-examination elicited a possible improper influence arising as of the summer of 2019, when Appellant threatened TC's career and accused MC and TC of blackmailing him. The witnesses described MC's statements to them as occurring within several weeks of 12 August 2018, long before the summer of 2019. In addition, in each case the admitted testimony regarding MC's prior statements, although not identical to MC's testimony, was consistent regarding particular facts of central importance to the trial, notably including that Appellant pushed MC against the side of the vehicle and attempted to kiss her or did kiss her without her consent.

Appellant argues that there is a distinction between a motive to fabricate and a motive to report. He notes that the Defense's theory at trial was that Appellant and MC kissed consensually, and that MC's motive to claim it was nonconsensual in order to protect her marriage to TC arose immediately on 12 August 2018. He acknowledges that MC claimed to several people that the event was nonconsensual long before the summer of 2019 and TC's OSI interview in December 2019. However, MC and TC chose not to report the alleged offenses for more than a year, until after Appellant accused them of blackmail and threatened TC's career. At that point, Appellant reasons, MC's claim was not a *new* fabrication, but simply the repetition of an existing false account.

We are not persuaded by Appellant's distinction. A prior consistent statement is not required to precede every motive to fabricate or other improper influence. The military judge could have reasonably concluded that every time MC or TC made a new statement, it was subject to being affected by improper influences that had arisen after the previous statement was made. To the extent the prior statement is consistent with the later statement, the prior statement tends to counteract the implication of an improper influence. Even if the Defense's theory was that MC had already made a false allegation, any

subsequent statements could be influenced by intervening events, including threats to TC's career and allegations that MC and TC were engaging in blackmail.

Appellant also contends the testimony of DH and DM regarding MC's prior statements is not consistent with MC's testimony, in that DH and DM recall MC stating only that Appellant "attempted" or "tried" to kiss her, rather than actually kissed her. This is perhaps a distinction, but not technically an inconsistency. MC testified to the effect that Appellant attempted to kiss her and succeeded. DH and DM did not describe MC telling them that Appellant failed to kiss her, which would have been inconsistent with MC's testimony. Moreover, in a situation where one person kisses another without consent and is pushed away, one might describe the incident as an attempted kiss that was not reciprocated. In any event, without engaging in further hair-splitting, we find the testimony of DH and DM regarding MC's prior statement sufficiently similar to MC's testimony that the military judge's ruling was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *See Erikson*, 76 M.J. at 234 (citation omitted). Accordingly, we find the military judge did not abuse her discretion.

## C. Cross-Examination of Prosecution Witness

### 1. Additional Background

On 28 January 2021, TC underwent an OSI polygraph examination and interview related to his civilian employment at AFRL and not directly related to the investigation of Appellant. At one point during that interview, TC commented on income tax returns he filed with his wife, MC. TC stated, *inter alia*, MC was "very aggressive, I'll kind of fault her" when it came to taking income tax deductions. TC further stated his "comfort zone was not [wa]s not where [his] wife and [he] have ended up on filing taxes." Trial counsel disclosed these statements to trial defense counsel before Appellant's court-martial.

At trial, during trial defense counsel's cross-examination of TC, the following colloquy occurred:

> Q [Civilian Defense Counsel (CDC)]: [TC], in that same [OSI] interview, you also opined that your wife is an aggressive liar?
>
> CTC [Circuit Trial Counsel]: Objection, Your Honor. Hearsay.
>
> MJ [Military Judge]: You may ask it another way, sustained.
>
> Q: [TC], you believe -- it is your opinion that your wife is an aggressive liar?
>
> [TC]: No.

Q: Isn't it true that in January of 20 -- excuse me, 2021, during an interview with the [OSI], that you said, when it came to things that are false, that your wife is very aggressive and you'll fault her?

CTC: Objection, Your Honor. Hearsay. And I'd add improper impeachment, as well Your Honor. The witness said his opinion is that -- he said no to the question whether or not his opinion was that his wife is an aggressive liar, and this certainly doesn't impeach that.

MJ: Defense, do you wish to be heard?

CDC: Your Honor, it impeaches that this very witness, during an interview with [OSI], made an official statement with the words to the effect that his wife is very aggressive when it comes to filing things that are false. So he has previously stated that it is his belief, effectively, that his wife -- it is his opinion, that his wife is an aggressive liar.

MJ: The way you framed the question, sustained. If you can ask it another way, counsel, you can get there.

. . . .

Q. [TC], in that interview that I've just been discussing, did you in fact say an investigator would say it's false, my wife is very aggressive. I'll fault her. She wants to be very aggressive on those things.

CTC: Objection, Your Honor. Improper impeachment, hearsay.

MJ: Defense?

CDC: Your Honor, it's not an improper impeachment. It is a prior statement made by this witness and all I'm asking him [is] if, in fact, he did say that at a prior point in time.

CTC: Which is exactly the definition of hearsay, Your Honor. And it is not -- it is not a statement that he previously made. If this witness had previously just prior to this court had said in an interview, my opinion is that my wife is an aggressive liar, that would be a prior inconsistent statement, with the direct statement that he made in court today that his wife is not in response to defense counsel questions. That is not what defense counsel that is offering here. It's very clearly identified by their statement. I think defense counsel's own argument that no, we want to -- this -- this is not improper impeachment, we just want

> to offer this witness' own prior statement that has nothing to do with specifically the opinion about whether or not his wife is an aggressive liar, Your Honor.
>
> MJ: Defense, do you wish to be heard any further?
>
> CDC: No, Your Honor.
>
> MJ: Sustained.

At that point, trial defense counsel moved on to a different line of questioning.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *Erikson*, 76 M.J. at 234 (citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Kelly*, 72 M.J. at 242 (citation omitted). "The abuse of discretion standard is a strict one, calling for more than just a difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

"The process of impeachment by prior inconsistent statement is a tool to attack the credibility and/or recollection of a witness. 'By showing self-contradiction, the witness can be discredited as a person capable of error.'" *United States v. Harrow*, 65 M.J. 190, 199 (C.A.A.F. 2007) (quoting *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983)) (additional citation omitted). "The impeachment power of a prior-inconsistent-statement rule of evidence arises from the conflict between a witness' statements." *United States v. Damatta-Olivera*, 37 M.J. 474, 477 (C.M.A. 1993) (citation omitted). "A military judge has considerable discretion to determine if the trial testimony is inconsistent with a prior statement." *Harrow*, 65 M.J. at 200 (citing *Damatta-Olivera*, 37 M.J. at 478) (additional citation omitted).

Whether an error is harmless is a question of law we review de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

### 3. Analysis

Appellant contends the military judge abused her discretion by sustaining trial counsel's objections to cross-examination about TC's prior statements to OSI regarding MC with respect to their tax returns. Appellant contends such evidence would have been admissible under two theories: as evidence of TC's bias toward MC under Mil. R. Evid. 608(c), and as a prior inconsistent statement to impeach TC's testimony. We find Appellant is not entitled to relief.

Beginning with evidence of bias under Mil. R. Evid. 608(c), this was not the basis trial defense counsel argued to the military judge at trial. Trial defense counsel specifically argued impeachment of TC's testimony. Based on the totality of the circumstances, we do not find the military judge abused her discretion by failing to allow questioning based on the rationale which was not presented to her.

With respect to impeaching TC's testimony, TC testified he did not have the opinion that his wife MC was "an aggressive liar." Trial defense counsel then asked whether TC had told OSI, "[W]hen it came to things that are false, that your wife is very aggressive and you'll fault her." Trial counsel objected on the grounds that TC's purported statement to OSI was hearsay, and that it did not impeach TC's statement that he did not have the opinion that MC was an aggressive liar. As to hearsay, if trial defense counsel was eliciting TC's statement to OSI in order to impeach TC's testimony, rather than for the truth of the matter asserted, then it would not be hearsay. *See* Mil. R. Evid. 801(c)(2). However, TC's purported statement to OSI that "when it came to things that are false, [MC] [wa]s very aggressive" is sufficiently distinct from whether TC held the opinion that MC was "an aggressive liar" that we do not find the military judge's preclusion of the question on impeachment grounds was "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Solomon*, 72 M.J. at 179. Likewise, we find trial defense counsel's subsequent question as to whether TC told OSI, "an investigator would say it's false, my wife is very aggressive. I'll fault her. She wants to be very aggressive on those things," was sufficiently dissimilar from an opinion that MC is "an aggressive liar" that we find the military judge did not abuse her discretion in sustaining the objection.

Moreover, assuming for purposes of analysis that the military judge did abuse her discretion by sustaining the Government's objection to this impeachment evidence, we find Appellant suffered no material prejudice to his substantial rights. Considering the *Kerr* factors, we find the rulings had no substantial influence on the findings. *See Bowen*, 76 M.J. at 89 (citation omitted). In light of MC's clear testimony, her prior consistent statements close in time to the offense, and Appellant's apologies and admissions, we find the Government's case was relatively strong and the Defense's case relatively weak. We further find the materiality of the excluded testimony to be negligible. The

Defense's basis for introducing the excluded testimony was to impeach TC's testimony—which trial defense counsel elicited—that TC did not have the opinion that MC was an aggressive liar. To the extent the excluded questions had any tendency to undermine TC's absence of an opinion that MC was an aggressive liar, that non-opinion was of scant significance in the broader scope of the entire court-martial. Finally, the quality of the evidence—commentary specifically about MC's approach to income taxes that had only implied, if any, significance to TC's opinion whether MC was an aggressive liar in general— was, for purposes of factfinding in Appellant's court-martial, low. Accordingly, assuming *arguendo* the military judge erred, Appellant is entitled to no relief.

**D. Judicial Notice**

### 1. Additional Background

During presentencing proceedings, trial defense counsel requested the military judge take judicial notice of a matter of domestic law. Specifically, the Defense requested the military judge take judicial notice of Article 120(g)(2)(B), UCMJ, 10 U.S.C. § 920(g)(2)(B), that was in effect prior to 1 January 2019, and Article 120(g)(2)(B), UCMJ, 10 U.S.C. § 920(g)(2)(B), that became effective on 1 January 2019. Trial defense counsel argued the change in the law was an appropriate matter in mitigation for the military judge to consider, explaining:

> [T]he reason why it's relevant in this particular case, Your Honor, is because, effectively, Your Honor, as the law stands today, the offense that [Appellant] now stands convicted of is no longer an offense under Article 120, thus not a sexual offense. And that would be appropriate for this court's consideration in determining what an appropriate sentence is as of today.

> . . . .

> It's relevant and appropriate for the court to consider that this offense, were it done a few months later, or thinking about it a different way, done today, would be an assault consummated by a battery. Which has a six month maximum.[9] And so, when the court is making a determination about what is an appropriate sentence today, an understanding of the state of the law and the priorities that the Air Force as determined by Congress can be and should be viewed differently.

---

[9] *See* 10 U.S.C. § 928; *Manual for Courts-Martial, United States* (2019 ed.), Part IV, ¶ 77.d.(2)(a).

The Government opposed the defense request for judicial notice, contending that the change to Article 120, UCMJ, which occurred after Appellant's offense was not relevant to his court-martial.

The military judge denied the request. She explained:

> The duty of this court in sentencing is to provide a proper sentence for the offense of which the accused has been found guilty under the law in which he has been found guilty for. That does not include laws that have changed since then or that existed prior to that. He was convicted of the offense that occurred on or about 12 August 2018 under the law that was applicable at that time. The passage of time did not change that. The court will only consider the law that was applicable then and declines to take judicial notice, as the law that was in effect on 1 January 2019 is not relevant to that issue. The court will not consider it as such.

**2. Law**

"The military judge may take judicial notice of domestic law. If a domestic law is a fact that is of consequence to the determination of the action, the procedural requirements of Mil. R. Evid. 201—except Rule 201(f)—apply." Mil. R. Evid. 202(a).

"The military judge . . . must take judicial notice if a party requests it and the military judge is supplied with the necessary information." Mil. R. Evid. 201(c)(2).

"We will review a military judge's decision whether to take judicial notice for an abuse of discretion." *United States v. Lutes*, 72 M.J. 530, 533 (A.F. Ct. Crim. App. 2013) (citation omitted).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Mil. R. Evid. 401. Relevant evidence is generally admissible, unless another provision of law provides otherwise; irrelevant evidence is not admissible. Mil. R. Evid. 402.

Prior to 1 January 2019, 10 U.S.C. § 920(g)(2)(B) provided that the term "sexual contact" included "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." As of 1 January 2019, 10 U.S.C. § 920(g)(2) provides the term "sexual contact" means touching, directly or through clothing, specifically enumerated body parts, including the "vulva, penis, scrotum, anus, groin, breast, inner thigh, or buttocks of any person, with an intent to

abuse, humiliate, harass, or degrade any person or arouse or gratify the sexual desire of any person."

### 3. Analysis

Appellant contends the military judge abused her discretion by denying the Defense's request for judicial notice of the change to Article 120(g)(2), UCMJ, effective 1 January 2019. He argues Congress's decision that a kiss on the mouth should no longer qualify as abusive sexual contact under Article 120, UCMJ, was an appropriate matter in mitigation, and that Mil. R. Evid. 201(c) required the military judge to take judicial notice once the Defense provided her with the "necessary information"—that is, the law in question. Appellant further contends he was prejudiced by the error in light of the severity of his sentence and the compelling mitigating nature of the change in the law.

We find the military judge did not abuse her discretion. Mil. R. Evid. 202 and 201(c) would have required the military judge to take judicial notice only if the change in the law was "of consequence to the determination of the action." The military judge could reasonably conclude the only version of Article 120, UCMJ, that was of consequence to Appellant's sentencing was the version that was in effect based on the date of the offense. We do not find the military judge's conclusion that she would only consider the law applicable to Appellant's offense to be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Solomon*, 72 M.J. at 179.

### E. Sentence Severity

#### 1. Law

Courts of Criminal Appeals review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). We are required "to review the appropriateness of each punishment in the adjudged sentence." *United States v. Flores*, 84 M.J. 277, 281 (C.A.A.F. 2024) (citations omitted). Although the Courts of Criminal Appeals are empowered to "do justice[ ] with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

The Eighth Amendment[10] prohibits the imposition of "excessive fines." "The Excessive Fines Clause thus 'limits the [G]overnment's power to extract payments, whether in cash or in kind, 'as punishment for some offense.' Forfeitures – payments in kind – are thus 'fines' [within the meaning of the Eighth Amendment] if they constitute punishment for an offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)); *see also United States v. Reed*, 54 M.J. 37, 44 (C.A.A.F. 2000) (citing *Bajakajian*). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Stebbins*, 61 M.J. 366, 373 (C.A.A.F. 2005) (quoting *Bajakajian*, 524 U.S. at 334). A fine violates the Eighth Amendment if it is "grossly disproportionate" to the offense. *Id.* (quoting *Bajakajian*, 524 U.S. at 334). "This proportionality analysis under the Excessive Fines Clause is conducted on a case-by-case basis and is distinguishable from the determination of sentence appropriateness required by Article 66[, UCMJ]." *Id.* (citation omitted).

### 2. Analysis

Appellant contends the adjudged forfeiture of $10,910.00 pay per month for five months is both inappropriately severe, as a matter of our Article 66, UCMJ, sentence appropriateness review, and unconstitutional under the Excessive Fines Clause of the Eighth Amendment. Appellant cites, *inter alia*, his lengthy service; his strong sentencing case, including character letters and numerous decorations and awards; and his apologies to MC and others. He also cites the change to the UCMJ, as described above with respect to the military judge's ruling on judicial notice, to the effect that if Appellant had kissed MC on the mouth after 1 January 2019, it would have been punishable as an assault under Article 128, UCMJ, rather than abusive sexual contact under Article 120, UCMJ. In a similar vein, he contends that under New Mexico law his offense would have constituted only the petty misdemeanor of battery, punishable by a fine not to exceed $500.00.[11] *See* N.M.S.A. §§ 30-3-4; 31-19-1. Specifically with regard to the Eighth Amendment, Appellant contends "adjudged forfeitures totaling $54,550.00 for a kiss on the mouth that did not result in any physical injury" is unconstitutional because it does not bear some relationship to the gravity of the offense. *See Stebbins*, 61 M.J. at 373 (citing *Bajakajian*, 524 U.S. at 328).

---

[10] U. S. CONST. amend. VIII.

[11] Appellant declines to mention such offenses are also punishable by up to six months in jail. N.M.S.A. § 31-19-1.

We do not find Appellant's sentence inappropriately severe. Appellant faced a maximum imposable sentence that included a dismissal, confinement for seven years, and total forfeiture of pay and allowances, in addition to a reprimand. Appellant's sentence amounted to forfeiture of approximately two-thirds of his pay per month for five months, and a reprimand. The total forfeiture, although perhaps large in absolute terms, would not in itself leave Appellant destitute in light of his pay grade and allowances, and Appellant has not identified any particular financial hardship as a result of his sentence. Moreover, Appellant escaped the most severe punishments available—punitive discharge and confinement. That Appellant might have faced a less severe maximum punishment had he been charged in a different jurisdiction or at a later point in time is of slight, if any, significance.

In addition, the military judge could reasonably find several aggravating circumstances to the offense. Appellant was married at the time, and his victim, MC, was his brother's spouse. After MC attempted to discourage Appellant's sexual advances, he accomplished the kiss by suddenly grabbing MC by the shoulders and forcing her against the vehicle window. Appellant not only kissed MC with his lips, but penetrated her mouth with his tongue. After MC pushed Appellant off her and told him to stop, he moved toward her again, forcing MC to push him away a second time.

## F. Post-Trial and Appellate Delay

Appellant's record of trial was docketed with this court on 1 May 2023. On the same day, Appellant moved this court to compel the production of a verbatim transcript of the court-martial proceedings, which the Government opposed. On 27 May 2023, the Government moved this court to dismiss the appeal for lack of jurisdiction; Appellant opposed the motion.[12] On 7 July 2023, this court denied the Government's motion to dismiss, granted Appellant's motion to compel a verbatim transcript, and ordered the Government to prepare and deliver a certified verbatim transcript. On 22 August 2023, this court denied a government motion to reconsider its denial of the motion to dismiss. On 6 December 2023 and 11 January 2024, this court granted the Government's motions to attach the unsealed and sealed portions of the transcript, respectively.

Thereafter, Appellant requested and was granted 12 enlargements of time to file his assignments of error, over the Government's opposition, before filing his brief on 21 March 2025. The Government requested and received two

---

[12] As to this issue, *see generally United States v. Vanzant*, 84 M.J. 671, 673–80 (A.F. Ct. Crim. App. 2024), *rev. granted*, 85 M.J. 198 (C.A.A.F. 2024).

enlargements of time, without defense objection, before filing its answer brief on 22 May 2025, and Appellant filed a reply brief on 29 May 2025.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." *Id.* at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court.[13] Therefore, under *Moreno*, there is a facially

---

[13] We do not find a facially unreasonable delay in the post-trial processing of Appellant's case before docketing. In *United States v. Livak*, this court established an aggregated 150-day sentencing-to-docketing threshold for facially unreasonable delay in cases that were referred to trial on or after 1 January 2019. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). However, in light of subsequent statutory changes, this court recently found the 150-day threshold established in *Livak* does not apply to appeals, such as Appellant's, submitted under Article 66(b)(1)(A), UCMJ, 10 U.S.C. § 866(b)(1)(A), and filed after Congress amended Articles 66 and 69, UCMJ, 10 U.S.C. §§ 866, 869, effective 23 December 2022. *See* The National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, 544(b)(1)(A), (B), 135 Stat. 2395, 2582–84 (23 Dec. 2022); *United States v. Boren*, No. ACM 40296 (f rev), 2025 CCA LEXIS 103, at *47 (A.F. Ct. Crim. App. 19 Mar. 2025) (unpub. op.). However, in such cases we still review whether pre-docketing delay is facially unreasonable and warrants relief. *See United States v. Copp*, No. ACM 24029, 2025 CCA LEXIS 290, at *14 (A.F. Ct. Crim. App. 27

unreasonable delay. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant was not confined and has not alleged any particularized prejudice from the delay, and we perceive none. Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. The delay is primarily attributable to two causes: the Government's production of a verbatim transcript, and Appellant's 12 motions for enlargements of time in which to file his assignments of error. With regard to the verbatim transcript, we find the delay was substantial but not egregious. It took approximately six months from this court's 7 July 2023 order to produce the transcript until the Government delivered the complete transcript. However, the Government may have delayed its compliance until after this court denied its motion for reconsideration on 22 August 2023. In addition, the transcript was lengthy at over 1,600 pages. With regard to Appellant's 12 enlargements of time, these were granted at the Defense's request and over the Government's objection. We note Appellant was represented by retained civilian appellate defense counsel as well as detailed military appellate defense counsel throughout this period. Furthermore, we note the court is issuing its opinion within two months of receiving Appellant's reply brief. Considering the circumstances as a whole, we do not find the delay so egregious as to undermine public confidence in the military justice system.

Finally, we do not find relief for excessive delay pursuant to our statutory authority under Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2), is warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

---

Jun. 2025) (unpub. op.). Appellant's case became eligible for appeal to this court on 23 December 2022, when the amendments to Articles 66 and 69, UCMJ, went into effect. Appellant filed his notice of appeal with this court on 30 April 2023, and this court docketed his case the following day. We do not find any facially unreasonable pre-docketing delay attributable to the Government.

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court